T.C. Summary Opinion 2021-24

UNITED STATES TAX COURT

DION E. MONROE AND KIM M. MONROE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 16305-17S.                      Filed August 11, 2021.

Dion E. Monroe and Kim M. Monroe, pro sese.

<u>Douglas S. Polsky</u> and <u>Joseph P. Benoist</u>, for respondent.

SUMMARY OPINION

COPELAND, <u>Judge</u>:  This case was heard pursuant to the provisions of

section 7463[1] of the Internal Revenue Code in effect when the petition was filed.

_____

[1]Unless otherwise indicated, all section references are to the Internal
Revenue Code in effect at all relevant times, and all Rule references are to the Tax
Court Rules of Practice and Procedure.  All dollar amounts are rounded to the

(continued...)

Pursuant to section 7463(b), the decision to be entered is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.

Mr. and Mrs. Monroe seek redetermination of the following determinations by the Internal Revenue Service (IRS) set forth in a notice of deficiency dated April 26, 2017:

| Year | Deficiency | Accuracy-related penalty sec. 6662(a) |
|------|-----------|---------------------------------------|
| 2014 | $12,727 | $2,545 |
| 2015 | 11,561 | 2,312 |

The issues for decision are:

1.      whether the Monroes' gross receipts of $37,360 and $23,860 for tax years 2014 and 2015, respectively, reported on Schedules C, Profit or Loss From Business, should be recharacterized as "other income," and whether the amount for 2014 should be increased to the amount reported to the IRS by third parties, $38,862;

2.      whether the Monroes' expense deductions of $54,333 and $50,339 for tax years 2014 and 2015, respectively, reported on Schedules C should be

_____

[1](...continued)
nearest dollar.

recharacterized as miscellaneous itemized deductions reportable on Schedule A, Itemized Deductions;[2] and whether those deductions have been substantiated;

3.     whether the Monroes failed to report dividend income and capital gain income for tax years 2014 and 2015; and

4.     whether the Monroes are liable for substantial understatement of income tax penalties under section 6662(a) and (b)(2) for tax years 2014 and 2015.

Background

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated by this reference. The Monroes resided in Kansas when they timely filed their petition.

During 2014 and 2015 Mrs. Monroe received wages for which her employer issued Forms W-2, Wage and Tax Statement. During the same timeframe Mr. Monroe was employed as a car salesman at Shawnee Mission Hyundai (Shawnee), an automobile dealership. He received compensation from Shawnee for which the parent company for Shawnee issued him Forms W-2. His compensation from Shawnee was based entirely on commissions for the cars he sold. Shawnee paid Mr. Monroe commissions of $72,305 and $82,565 for tax years 2014 and 2015,

---

[2]If deductible on Schedule A rather than Schedule C, the amounts allowable would be reduced by the 2% floor generally applicable for such deductions.

respectively. Mr. Monroe was also eligible for certain performance incentive payments from Hyundai Motor America (Hyundai) based on the number of new cars that he sold. Hyundai paid Mr. Monroe incentive payments totaling $38,862 and $23,860 during 2014 and 2015, respectively.

In order to facilitate his overall car sales, Mr. Monroe engaged in certain marketing activities. Those activities involved offering incentives to: (1) potential customers who test drove a Shawnee vehicle for which Mr. Monroe was the designated salesman, (2) customers who purchased a Shawnee vehicle for which Mr. Monroe was the salesman, and (3) persons who referred customers to Mr. Monroe. The various incentives included a free round of golf for two people, lunch, dinner, a $100 gift card, or tickets to a Kansas City Chiefs football game.

Mr. Monroe would market these incentives by taking a day every other week to drive a circuit along which he would deliver to and post flyers at certain targeted insurance agencies, golf courses, golf stores, and junk yards. On days when he drove the circuit, Mr. Monroe used a phone application (app) to track his mileage. The app allowed him to manually enter the starting odometer reading; then it would use the phone's Global Positioning System receiver to track mileage driven and, at the end, add the mileage driven to the initial odometer reading to calculate a final odometer reading. The app also allowed Mr. Monroe to generate

a mileage log. His mileage logs included: (1) the date; (2) the time travel was initiated (but no other times); (3) a description, which is either "[d]eliver flyers" or "[d]eliver flyers/[s]etup tourn"; (4) a purpose, which is always "[b]usiness"; (5) a "From", which is always "Home"; (6) a "To", which is always "Golf Stores", "Golf Courses", "Junk Yards", or "Insurance Agents"; (7) a beginning odometer reading; (8) an ending odometer reading; and (9) a mileage calculation. Mr. Monroe's 2014 mileage log reflects 19,907 business miles driven, and his 2015 mileage log reflects 15,610 business miles driven.

Mr. Monroe was successful enough at selling new cars that he received substantial incentive payments from Hyundai. Hyundai issued the incentive payments to Mr. Monroe by depositing funds directly onto a prepaid card issued in his name. Mr. Monroe treated his prepaid card account as his business account and used it to pay costs associated with the above-described marketing activities. Among other expenditures he incurred, Mr. Monroe purchased advertising supplies and provided his customers with prizes such as golf rounds and meals using his Hyundai prepaid card. As an example of how Mr. Monroe used the prepaid card to track expenses, a customer might purchase a new Shawnee vehicle through Mr. Monroe at the beginning of the week and Mr. Monroe would take that customer to lunch later in the week. Mr. Monroe would pay for lunch with his

prepaid card.  Once a week he used the prepaid card account's online features to generate a spreadsheet, and he would type notes in the spreadsheet regarding that week's expenses.  This allowed Mr. Monroe to categorize his expenses.  In preparation for trial Mr. Monroe also added handwritten notations, such as customers' names, to the prepaid card transaction spreadsheets.

Occasionally, Mr. Monroe would charge a marketing expense to a personal account that he held with Bank of America.  In that circumstance he would annotate the expense directly through an online feature of that account.  For both years at issue, Mr. Monroe provided the IRS with his records from Bank of America, the prepaid card transaction spreadsheets, his customer list, and the mileage log from his app.  In preparation for trial Mr. Monroe added customer names and other handwritten notations on his customer list and Bank of America bank statements.

With regard to incentive payments, Hyundai issued Mr. Monroe Forms 1099-MISC, Miscellaneous Income, reporting that it paid him $38,862 and $23,860 in 2014 and 2015, respectively.  Petitioners timely filed their 2014 and 2015 joint tax returns on Forms 1040, U.S. Individual Income Tax Return.

Mr. Monroe reported the following income and expense items on Forms 1040, Schedules C:

| | 2014 | 2015 |
|---|---|---|
| Gross income | $37,360 | $23,860 |
| Expense | | |
| Advertising | 1,347 | 685 |
| Car and truck | 20,171 | 13,694 |
| Commissions and fees | 2,152 | -0- |
| Contract labor | 2,535 | -0- |
| Depreciation and sec. 179 | 1,696 | 1,206 |
| Legal and professional | 2,786 | 6,000 |
| Office | 2,351 | 9,810 |
| Rent or lease of vehicles, machinery, and equipment | -0- | 980 |
| Repairs and maintenance | 1,275 | -0- |
| Supplies | 2,594 | 2,526 |
| Taxes and licenses | 2,151 | -0- |
| Travel | 6,437 | 9,633 |
| Deductible meals and entertainment | 3,155 | 2,380 |
| Utilities | 1,589 | -0- |
| Other | 4,094 | 3,425 |
| Total expenses | 54,333 | 50,339 |
| Net income or loss | -16,973 | -26,479 |

In calculating the car and truck expenses listed in the table above for 2014, the Monroes reported three vehicles and their associated mileages on Form 4562, Depreciation and Amortization, as follows:

| Make of car | Business | Commuting | Personal | Total |
|---|---|---|---|---|
| Audi A | 2,815 | 412 | 90 | 3,317 |
| Audi A6 | 14,367 | 3,211 | 986 | 18,564 |
| Volkswagen | 16,855 | 6,211 | 2,279 | 25,345 |
| 2014 Totals | 34,037 | 9,834 | 3,355 | 47,226 |

For 2015, the Monroes reported five vehicles and their associated mileages on Form 4562 as follows:

| Make of car | Business | Commuting | Personal | Total |
|---|---|---|---|---|
| Hyundai Sonata | 6,432 | 11 | 7,890 | 14,333 |
| Hyundai Genesis | 9,178 | 7 | 1,045 | 10,230 |
| Audi | 3,178 | 7 | 325 | 3,510 |
| Audi A6 | 208 | 0 | 137 | 345 |
| Volkswagen | 2,435 | 10 | 445 | 2,890 |
| 2015 Totals | 21,431 | 35 | 9,842 | 31,308 |

For 2014, the "depreciation and section 179" expense listed in the table supra p. 7 was composed of a section 179 expense of $1,696 (reportedly for a desktop computer and a cell phone). In 2015, it was composed of a section 179

expense of $763 (reportedly for a cell phone) and an MACRS depreciation deduction of $443 (for property placed in service in a prior year) for a total of $1,206.

Unrelated to his car sales, Mr. Monroe was issued Forms 1099-DIV, Dividends and Distributions, from National Financial Services LLC (National Financial) for 2014 and 2015; those forms reported taxable dividend income of $74 and $102, respectively. The Monroes failed to report any dividend income on their 2014 or 2015 joint return.

Similarly, National Financial issued Mr. Monroe Forms 1099-B, Proceeds From Broker and Barter Exchange Transactions, relating to the sales of stock. For 2014 those sales amounted to $134 in short-term capital gain and $1,930 in long-term capital gain. For 2015 those sales amounted to $626 in short-term capital gain and $284 in long-term capital gain. The Monroes failed to report any capital gain income on their 2014 or 2015 joint return.

One of the IRS revenue agents involved in the examination of the Monroes' tax returns for 2014 and 2015 was Sheila Alexander. During the examination Revenue Agent Alexander filled out a Form 300, Civil Penalty Approval Form, dated February 10, 2017, requesting to assert a substantial understatement penalty for each year. On February 21, 2017, Ms. Petruska, the group manager for

Revenue Agent Alexander, signed the Civil Penalty Approval Form. Shortly thereafter, on April 26, 2017, a notice of deficiency for the relevant tax years was issued denying all of the Monroes' Schedule C deductions, recharacterizing the Schedule C income as "other income," including the unreported dividend and capital gain income as unreported taxable income, and determining section 6662(a) underpayment penalties attributable to (1) negligence or disregard of rules or regulations, (2) substantial understatement of income tax, or (3) substantial valuation overstatement even though Ms. Petruska's approval was only for a penalty for substantial understatement of income tax.[3]

## Discussion

I.    Burden of Proof

Generally, the IRS' determination of a deficiency is presumed correct, and a taxpayer bears the burden of proving otherwise. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). The taxpayer likewise bears the burden of proving his or her entitlement to deductions and of substantiating the amounts paid for items underlying claimed deductions. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); sec. 1.6001-1(a), Income Tax Regs. At a minimum a taxpayer

_____

[3]At trial and in his briefing the Commissioner asserted only the substantial understatement penalty, consistent with the managerial approval obtained.

must produce business records or other evidence substantiating the amounts and the purpose of the items underlying deductions that they assert the IRS improperly disallowed and demonstrate that the deductions are allowable. Sec. 6001; Higbee v. Commissioner, 116 T.C. 438, 440 (2001); Hradesky v. Commissioner, 65 T.C. 87, 89-90 (1975), aff'd per curiam, 540 F.2d 821 (5th Cir. 1976). If the taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining his or her liability and satisfies other conditions, then the burden of proof shifts to respondent, the Commissioner of the IRS, with respect to that issue. Sec. 7491(a)(1) and (2). The Monroes have not argued that section 7491(a) applies, nor have they established that its requirements are met. The burden of proof remains with them.

II.    Analysis

The Commissioner contends that the incentive payments Mr. Monroe received from Hyundai were not self-employment income and that any related allowable deduction should have been reported as "Other Expenses" on Schedule A, rather than Schedule C.[4] The Commissioner maintains that such

_____

[4]The IRS' position is that these payments are "Other Expenses" under "Job Expenses and Most Other Miscellaneous Deductions" subject to a 2% adjusted gross income limitation. See IRS Publication 3204, Automotive Manufacturers' Incentive Program (rev. February 2008). However, we note that IRS publications

(continued...)

treatment is proper because Mr. Monroe's activities related to selling cars for Shawnee and his receipt of payments from Hyundai was not from a separate trade or business. The Commissioner further contends that we should disallow all of Mr. Monroe's claimed Schedule A expense deductions for failure to appropriately substantiate. Mr. Monroe contends that he was operating an independent trade or business with respect to incentive payments and that most of his expenses are substantiated. We address the parties' contentions in turn.

A.    Incentive Payments

Neither party claims that Mr. Monroe was a statutory employee under section 3121(d)(3) as to the Hyundai incentive payments. The Commissioner has not asserted that Mr. Monroe is liable for self-employment tax as to the incentive payments. The parties likewise do not dispute that Mr. Monroe was an employee of Shawnee and not an employee of Hyundai and that he earned income from both. Mr. Monroe claims, as to the incentive payments, that he is in the marketing business. However, "not every income-producing and profit-making endeavor constitutes a trade or business." Commissioner v. Groetzinger, 480 U.S. 23, 35

---

[4](...continued)
do not have the force of law. See Miller v. Commissioner, 114 T.C. 184, 194-195 (2000) ("The authoritative sources of Federal tax law are the statutes, regulations, and judicial decisions; they do not include informal IRS publications.").

(1987).  The situation here is that the Mr. Monroe's profit-based activity benefited his car sales as an employee and also helped him receive incentive payments from Hyundai.  Thus, the fairest characterization of the incentive payments, especially given the Commissioner's concession as to self-employment tax, is that the incentive payments are simply income to Mr. Monroe, and we so hold.  In addition, Mr. Monroe provided no explanation for the difference between incentive payments he reported on his return for 2014, $37,360, and the amount Hyundai reported to the IRS, $38,862; and thus, we hold he received the higher amount as reported by Hyundai.[5]

B.    Expenses

The key item left for dispute is whether Mr. Monroe's expenses were sufficiently linked to an income-producing activity and substantiated.  A cash basis taxpayer may deduct ordinary and necessary expenses paid during the taxable year in carrying on a trade or business.  Sec. 162(a).  However, "expenses not incurred in a trade or business activity but in the production or collection of income are deductible only as miscellaneous itemized deductions on a Schedule A.  Secs. 67(b), 212(1)."  Kenton v. Commissioner, T.C. Memo. 2006-13, 91 T.C.M.

---

[5]While sec. 6201(d) sometimes places upon respondent a burden as to an amount reported as income on an information return, we conclude that this is not one of those occasions.

(CCH) 679, 680 (2006). Likewise, an individual performing services as an employee may generally deduct unreimbursed employment-related expenses incurred as miscellaneous itemized deductions on Schedule A. Id. In both cases the miscellaneous itemized deductions of such an individual are deductible only to the extent that they exceed 2% of the taxpayer's adjusted gross income. Secs. 63(d), 67(a) and (b), and 212.

If the taxpayer is able to establish that he paid or incurred a deductible expense but is unable to substantiate the precise amount, the Court generally may approximate the deductible amount, but only if the taxpayer presents sufficient evidence to establish a rational basis for making the estimate. See Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930). However, certain deductions under section 274 are subject to strict substantiation rules that supersede the Cohan rule; those deductions include: travel, meals, entertainment, gifts, and automobile expenses. See secs. 274(d), 280F(d)(4); Sanford v. Commissioner, 50 T.C. 823, 827-828 (1968), aff'd per curiam, 412 F.2d 201 (2d Cir. 1969); sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985). The record must show that expenses were in pursuit of profit rather than personal and that they were ordinary and necessary. Rule 142(a); Welch v. Helvering, 290 U.S. at 115. To satisfy a taxpayer's burden of substantiation, the record must

reflect sufficient permanent records or books of account to support the amounts of deductions claimed on the return. Sec. 6001; sec. 1.6001-1(a), (e), Income Tax Regs.

The Commissioner conceded that all of Mr. Monroe's deductible expenses should have been reported on Schedule A, but argues that the expenses are not supported by the record. What is clear is that the expenses increased Mr. Monroe's car sales leading to extra commissions as an employee of Shawnee and at the same time allowed him to produce substantial income from Hyundai. While the parties did not provide the Court a way to delineate between expenses related to commissions versus incentive payments, it is clear that the expenses benefited both. We decline to make a random guess as to any such breakdown and proceed on the basis of respondent's concession that the expenses, to the extent substantiated, are miscellaneous itemized deductions subject to the 2% floor. See secs. 67, 212

We now analyze each expense in the order presented in the table supra p. 7.

### 1. Advertising

The Monroes deducted $1,347 in advertising expenses for 2014 and $685 for 2015. Mr. Monroe credibly testified regarding his advertising purchases and provided contemporaneously annotated prepaid card transaction spreadsheets

sufficiently corroborating his testimony.  We hold that the Monroes are entitled to the advertising expense deductions.

### 2. Car and Truck Expenses

The Monroes deducted $20,171 in car and truck expenses for 2014, and $13,694 for 2015.  Expenses relating to passenger automobiles are subject to the strict substantiation rules of section 274.  Under that section, a taxpayer must maintain adequate records or sufficient evidence corroborating his own statement including the following:  (1) the amount of each separate expense; (2) the mileage for each business use of the passenger automobile and the total mileage for all purposes during the taxable period; (3) the date of the business use; and (4) the business purpose of the use.  See sec. 1.274-5T(b)(6), Temporary Income Tax Regs., 50 Fed. Reg. 46016 (Nov. 6, 1985).  Substantiation by adequate records generally requires the taxpayer to "maintain an account book, diary, log, statement of expense, trip sheets, or similar record" prepared contemporaneously with the use of the passenger automobile as well as documentary evidence of the individual, actual expenses.  Id. para. (c)(2), 50 Fed. Reg. 46017.

Mr. Monroe's bank statements in the record for this expense include a charge of $577.17 on April 13, 2015.  The official charge was to "Checkcard [XXXX] Dan Pro Auto Care Lenexa."  The margin contains the handwritten note

"Auto Repair." For several reasons, the information provided is insufficient to corroborate <u>actual</u> vehicle expenses. First, we find no receipt for the charge. Second, the Monroes listed five vehicles on their 2015 tax return; we are unable to decipher to which vehicle this charge is related. As a result, we are further unable to determine which percentage of this charge is attributable to business use and which percentage is attributable to personal use. <u>See, e.g.</u>, <u>Larson v. Commissioner</u>, T.C. Memo. 2008-187, 2008 WL 2986387, at *5; sec. 1.274-5T(d)(2)(i), Temporary Income Tax Regs., 50 Fed. Reg. 46025 (Nov. 6, 1985). We therefore deny any deductions for <u>actual</u> vehicle expenses.

In lieu of substantiating the actual amount, taxpayers who deduct vehicle expenses may instead compute their deductions through use of a predetermined standard mileage rate. <u>See, e.g.</u>, <u>Nash v. Commissioner</u>, 60 T.C. 503, 520 (1973); <u>see also</u> sec. 1.274-5(j)(2), Income Tax Regs. The standard mileage method includes an allowance for all fixed and variable costs of a vehicle, including depreciation, maintenance and repairs, tires, gasoline, oil, insurance, and other fees. <u>See</u> <u>Campana v. Commissioner</u>, T.C. Memo. 1990-395; Rev. Proc. 2010-51, sec. 4.02, 2010-51 I.R.B. 883, 884-885. Under the standard mileage method a taxpayer deducts vehicle expenses in an amount equal to the predetermined rate set by the IRS each year multiplied by the number of business miles driven in the

year.  See sec. 1.274-5(j)(2), Income Tax Regs.  For 2014, the standard mileage rate was 56 cents per mile.  See Notice 2013-80, sec. 3, 2013-52 I.R.B. 821, 821. For 2015 the standard mileage rate was 57.5 cents per mile.  See Notice 2014-79, sec. 3, 2014-53 I.R.B. 1001, 1001.

In addition to credible testimony, the Monroes provided contemporaneous mileage logs, which they were able to relate back to Mr. Monroe's customer lists. For 2014 Mr. Monroe's mileage log states that he drove 19,907 miles for business purposes.  Similarly, Mr. Monroe's 2015 mileage log states that he drove 15,610 miles for business purposes.  We will accept the mileage shown in the contemporaneous mileage log for each year.  Thus, we hold that the Monroes are entitled to deduct car and truck expenses of $11,148 (19,907 × .56) for 2014 and $8,976 for 2015 (15,610 × .575).

### 3. Commissions and Fees

The Monroes deducted $2,152 in expenses for commissions and fees for 2014 and none for 2015.  The record contains neither testimony nor sufficient substantiating evidence as to what commissions and fees Mr. Monroe paid or how they related to his work selling cars.  We therefore deny the commissions and fees deduction.

### 4. Contract Labor

The Monroes deducted $2,535 in expenses during 2014 for contract labor. They deducted no such expenses during 2015. The record contains no evidence to substantiate these expenses. We therefore deny the contract labor deduction.

### 5. Depreciation and Section 179 Expense Deduction

The Monroes deducted a section 179 expense of $1,696 for a desktop computer and a cell phone on their 2014 return, and a section 179 expense of $763 for a cell phone and an MACRS depreciation deduction of $443 (for property placed in service in a prior year) for a total of $1,206 on their 2015 return. The record contains no evidence to substantiate these expenses. We therefore deny these deductions.

### 6. Legal and Professional Services

For 2014 and 2015, respectively, the Monroes deducted $2,786 and $6,000 for legal and professional services. Mr. Monroe testified that he could not produce any records as to the 2014 legal expenses, and he was otherwise unable to substantiate those expenses; we will therefore deny the 2014 legal and professional services deduction. Regarding 2015, Mr. Monroe showed that he made payments to two law firms, "Gordon & Associate" and "Tax Tiger," but he did not establish how the legal services related to his work selling cars. Mr. Monroe's

own testimony indicated that the legal services in 2015 were for an unrelated dispute with the IRS. We deny this 2015 deduction as well.

### 7. Office Expenses

The Monroes deducted $2,351 in office expenses on their 2014 return and $9,810 on their 2015 return. Mr. Monroe provided his prepaid card transaction spreadsheets, which identified several "office" related expenses. For 2014 he listed $353 for an office computer, $1,069 for an office desk, and $681 for another office desk. The office desks and the office computer do not appear to have been used in connection with Mr. Monroe's work selling cars, and he did not otherwise maintain or produce adequate records for the remaining 2014 office expenses. For 2015 office-related items were not listed on either the prepaid card transaction spreadsheets or bank statements and were not otherwise substantiated. We therefore deny the office expenses deductions.

### 8. Rent or Lease of Vehicles, Machinery, and Equipment

The Monroes deducted $980 in expenses relating to the rent or lease of vehicles, machinery, and equipment for 2015; and no such expenses for 2014. The record contains no evidence to substantiate the rent or lease expenses. We therefore deny this deduction.

### 9. Repairs and Maintenance

The Monroes deducted $1,275 in expenses for 2014 for repairs and maintenance. They deducted no such expenses for 2015. The record contains no evidence to establish these expenses. We therefore deny the repairs and maintenance deduction.

### 10. Supplies

The Monroes deducted $2,594 in expenses for supplies for 2014, and $2,526 for 2015. Mr. Monroe credibly testified regarding his supply purchases and provided contemporaneously annotated prepaid card transaction spreadsheets and bank statements sufficiently corroborating his testimony. We hold that the Monroes are entitled to these supplies deductions.

### 11. Taxes and Licenses

The Monroes deducted $2,151 in taxes and licenses for 2014. They deducted no such expenses for 2015. Mr. Monroe provided 2014 annotated prepaid card transaction spreadsheets which identified as "TAXES" a $74.98 payment to "HRB ONLINE TAX PRODUCT" and provided a bank statement with monthly deductions for $150 and $3.95, both payable to "US TREASURY." We hold that the Monroes for 2014 are entitled to deduct $75 as tax preparation fees and deny the remainder of the taxes and licenses deduction.

12. Travel

The Monroes deducted $6,437 in travel expenses for 2014 and $9,633 in travel expenses for 2015. Travel expenses are subject to strict substantiation rules under section 274. While Mr. Monroe testified as to some travel expenses, and while some annotations on his records indicate travel expenses, the evidence provided was insufficient to satisfy the strict substantiation rules under section 274. We therefore deny the travel expenses deductions.

13. Deductible Meals and Entertainment

The Monroes reported $3,155 in deductible meals and entertainment for 2014, and another $2,380 for 2015. Meals and entertainment are both deductions subject to the section 274 strict substantiation rules. Mr. Monroe explained at trial how his incentive payments worked and how his bank statements relate back to his customer list. Here, some examples are illustrative. We begin by looking at Mr. Monroe's Bank of America statements. On April 14, 2015, a charge of $26.40 at Red Lobster had a handwritten annotation that stated "Kramer cust [sic] lunch." Problematic is that there is no receipt itemizing the meal expense and the handwritten annotation was made in preparation for trial rather than contemporaneously. Moreover, while we are certain that Red Lobster is a restaurant, the business purpose is not detailed on the contemporaneous record.

An April 22, 2015, entry shows a charge of $44.13 at Hen House #19 in Lenexa, Kansas. Even if the Hen House in Lenexa is a restaurant, there is nothing indicating that there was a business purpose for the expense.

With regard to the prepaid card transaction spreadsheets, Mr. Monroe's 2014 customer list indicates that he sold a Hyundai Elantra to a Mr. Heisler on March 1, 2014; it further indicates that Mr. Heisler was a "Winner" of one of Mr. Monroe's prize drawings. The spreadsheets indicated a March 9, 2014, charge of $50 at Cheddar's #01 in Overland Park, Kansas; a contemporaneous typed notation states "Cust [sic] Dinner." A handwritten notation made in preparation for trial states "Heisler." As Mr. Monroe explained at trial, there was typically a lag time between the sale of a car, the drawing of a winner, and the winner's using the prize at a convenient time. All of which makes sense; unfortunately, it unravels without the handwritten notation made in preparation for trial and because of the lack of receipts. Consider another charge on the spreadsheets: a February 28, 2014, charge to the "KC Chiefs" of $500, along with the contemporaneous typed notation "Cust [sic] Tickets." We cannot decipher from Mr. Monroe's customer list which client(s) the charge was for, and although we found his testimony credible, we do not find his recordkeeping sufficient to

corroborate his testimony under the section 274 strict substantiation rules.  We therefore deny the meals and entertainment deductions.

### 14.  Utilities

The Monroes deducted $1,589 in utilities expenses for their 2014 taxable year.  They deducted no such expenses for 2015.  The prepaid card spreadsheets identify a May 21, 2014, charge of $781 to "KCP&L" with the contemporaneous typed annotation "UTILITIES."  There is also a May 20, 2014, charge of $718.75 to "Kansas Gas Ser" with an identical notation.  The Monroes provided neither testimony nor other corroborating evidence for these expenses.  We therefore deny the 2014 utilities deduction.

### 15.  Other Expenses

The Monroes deducted $4,094 in other expenses for 2014 and $3,425 for 2015.  However, they provided neither testimony nor other sufficient corroborating evidence for these expenses for the Court to discern from the provided records which expenses would constitute "other expenses" or what their business purpose was.  Therefore, we deny the "other expenses" deductions.

### C.    Unreported Income

The Monroes received from National Financial a Form 1099-DIV for 2014 in the amount of $74 and another Form 1099-DIV for 2015 in the amount of $102;

however, the Monroes did not recognize either of those amounts as income for the respective years. The Monroes also received Forms 1099-B, relating to the sales of stock, from National Financial. For 2014 those sales amounted to $134 in short-term capital gain and $1,930 in long-term capital gain. For 2015 those sales amounted to $626 in short-term capital gain and $284 in long-term capital gain. However, the Monroes failed to report any capital gain on either their 2014 or 2015 joint return.

Section 61(a) provides that gross income includes "all income from whatever source derived." See Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 430 (1955). Section 61(a)(4) and (7) specifically defines gross income as including interest income and dividend income. Section 61(a)(3) specifically defines gross income as including "[g]ains derived from dealings in property."

The Monroes have not contested the IRS' determinations regarding their dividends received and capital gain. We consider the Monroes to have conceded the issue and hold for the Commissioner on this point.

III.    Section 6662(a) Accuracy-Related Penalty

We next determine whether the Monroes are liable for accuracy-related penalties under section 6662(a) and (b)(2) for their 2014 and 2015 tax years. The IRS may determine a penalty equal to 20% of any underpayment that arises from a

substantial understatement of income tax. See sec. 6662(b)(2). An understatement is substantial if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A).

Under section 7491(c) the Commissioner has the burden of production with respect to the section 6662(a) penalty. To meet his burden the Commissioner must produce sufficient evidence indicating that it is appropriate to impose the penalty against the Monroes. See Higbee v. Commissioner, 116 T.C. at 446. The Commissioner's burden of production under section 7491(c) also generally includes establishing compliance with the supervisory approval requirement of section 6751(b)(1). See Graev v. Commissioner, 149 T.C. 485, 493 (2017), supplementing and overruling in part 147 T.C. 460 (2016). Written supervisory approval must be obtained before the IRS formally communicates the penalty to the taxpayer. Clay v. Commissioner, 152 T.C. 223, 249 (2019), aff'd, 990 F.3d 1296 (11th Cir. 2021).

Here, Ms. Alexander, the revenue agent who performed an examination of the Monroes' tax returns for 2014 and 2015, made the initial determination to assert the accuracy-related penalties for substantial understatements. Ms. Petruska, who was Ms. Alexander's manager, signed a Civil Penalty Approval Form on February 21, 2017, approving that initial determination. The notice of

deficiency in this case was not issued until April 26, 2017. The Monroes have not claimed, nor does the record support a conclusion, that the Commissioner formally communicated his initial penalty determination to them before the date when the revenue agent's manager signed the Civil Penalty Approval Form approving the substantial understatement penalties for the relevant tax years. See Frost v. Commissioner, 154 T.C. 23, 36 (2020). Therefore, we hold that the substantial understatement penalties under section 6662(b)(2) for 2014 and 2015 were approved in writing before the first formal communication to the Monroes of the penalties and it is the only section 6662(a) penalty that applies in this case.

The Monroes may avoid liability for the section 6662(a) and (b)(2) penalties if they demonstrate that they had reasonable cause for the underpayments and acted in good faith with respect to them. See sec. 6664(c)(1); see also Higbee v. Commissioner, 116 T.C. at 447; Bunney v. Commissioner, 114 T.C. 259, 266 (2000); sec. 1.6664-4(b)(1), Income Tax Regs. Whether the Monroes acted with reasonable cause and in good faith depends on the facts and circumstances of the case. See sec. 1.6664-4(b)(1), Income Tax Regs. Generally, the most important factor is their effort to assess their proper tax liabilities. Id. A taxpayer's knowledge, education, and experience are relevant factors to indicate reasonable cause and good faith. Id.

All of the adjustments relate to the Monroes' failure to report some of their income or to the disallowed Schedule C deductions. The record reflects that some of the expenses were deductible on Schedule A. While the 2% floor may have limited some of the deductions we allowed, the Monroes were not unreasonable in claiming those amounts as Schedule C deductions in that the judiciary has never spoken on the proper characterization of those items in the setting herein. See, e.g., Bunney v. Commissioner, 114 T.C. at 266; Curtis Inv. Co. v. Commissioner, T.C. Memo. 2017-150, at *39 (citing Williams v. Commissioner, 123 T.C. 144, 153-154 (2004)), aff'd, 909 F.3d 1339 (11th Cir. 2018). As to the unreported income and as to the expense deductions that we specifically disallowed for reasons other than the 2% limitation, the Monroes did not establish that they are entitled to a reasonable cause defense. Consequently we hold that the Monroes are liable for the section 6662(a) and (b)(2) accuracy-related penalties to the extent the Rule 155 computations show there are underpayments attributable to substantial understatements of income tax, except not as to the portions of the understatements that relate to a limitation resulting from the 2% floor.

To reflect the foregoing,

Decision will be entered under Rule 155.